### THE PEOPLE *v.* JULIUS J. SMITH.

</div>

Form of an indictment for obtaining money by false pretenses.

It is no defense to a charge of obtaining money by false pretenses, that the person from whom the money was obtained by the prisoner, was, at the time, indebted to the prisoner to an amount equal to the sum obtained by the false representation, and that it was the intention of the prisoner to apply such money on such debt. SUTHERLAND, J., dissented.

The People *v.* Smith.

The following indictment for obtaining money by false pretenses was found against the prisoner.

*City and County of New York, ss:*

The Jurors of The People of the State of New York, in and for the body of the city and county of New York, upon their oath, present:

That Julius J. Smith, late of the first ward of the city of New York, in the county of New York aforesaid, well knowing that Rachel Stoesser, hereinafter mentioned, was then and there a customer, and in the habit of dealing with the firm of J. Riegelman & Deffaa, dealers in flour, doing business in said city, on the twenty-eighth day of October, in the year of our Lord one thousand eight hundred and sixty-two, at the ward, city and county aforesaid, with force and arms, on the day and year last aforesaid, with intent feloniously to cheat and defraud said Rachel, did then and there feloniously, unlawfully, knowingly and designedly, falsely pretend and represent to said Rachel, that he, the said Julius, was then and there a salesman and agent for the said firm of J. Riegelman & Deffaa, and that he, the said Julius, had then and there procured to be sent to said Rachel by said firm of J. Riegelman & Deffaa, ten barrels of flour and one bag of meal; and that he, the said Julius, had then and there full power and authority to collect and receive the price of said flour and meal from the said Rachel. And the said Rachel, then and there believing the said false pretenses and representations so made as aforesaid, by the said Julius, and being deceived thereby, was induced, by reason of the false pretenses and representations so made as aforesaid, to deliver and did then and there deliver to the said Julius the sum of eighty-two dollars and seventy cents in money, of the value of eighty-two dollars and seventy cents of the proper moneys, valuable things, goods, chattels, personal property and effects of the said Rachel, and the said Julius did then and there designedly receive and obtain the said sum in money of the value aforesaid of the said Rachel, of the proper moneys, valuable things, goods, chattels, per-

sonal property and effects of the said Rachel by means of the false pretenses and representations aforesaid, and with intent feloniously to cheat and defraud the said Rachel of the said sum in money of the value aforesaid.

Whereas, in truth and in fact, the said Julius was not then and there a salesman and agent for the said firm of J. Riegelman & Deffaa and had not then and there procured to be sent to said Rachel by the said firm of J. Riegelman & Deffaa, ten barrels of flour and one bag of meal; and whereas, in truth and in fact, he, the said Julius, had not then and there any power and authority to collect and receive the price of said flour and meal from the said Rachel. And whereas, in fact, and in truth, the pretenses and representations so made as aforesaid by the said Julius to the said Rachel, were in all respects utterly false and untrue, to wit, on the day and year last aforesaid, at the ward, city and county aforesaid. And whereas, in fact and in truth, the said Julius well knew the said pretenses and representations, so by him made as aforesaid to the said Rachel, to be utterly false and untrue at the time of making the same.

And so the jurors aforesaid, upon their oath aforesaid, do say, that the said Julius J. Smith, by means of the false pretenses and representations aforesaid, on the day and year aforesaid, at the ward, city and county aforesaid, feloniously, unlawfully, falsely, knowingly and designedly, did receive and obtain from the said Rachel the sum in money, of the value aforesaid of the proper moneys, valuable things, goods, chattels, personal property and effects of the said Rachel, with intent feloniously to cheat and defraud her of the same, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York and their dignity.

A. OAKEY HALL, *District Attorney.*

To this indictment, a plea of not guilty was put in, and the issue so joined came on to be tried at the Court of General Sessions of the Peace in the city of New York, before JOHN T. HOFFMAN, recorder, in December, 1862.

*Rachel Stoesser*, the complainant, testified: That she was engaged in carrying on the business of a baker in Delancy street, in the city of New York, on her own account and with her own means, in the absence of her husband, who had left her; that on the 28th October, 1863, the prisoner called at her place of business and sold her ten barrels of flour and one bag of Indian meal, and said he would send the flour up the same evening; that the prisoner was, at the time, clerk or salesman for Riegelman & Deffaa; that between four and five o'clock on the afternoon of the same day, the prisoner again came there and asked her if the flour had come, and she answered "no;" that he then said the carman left the store with him, and had the flour to bring to her, and was coming to her shop with it, and wanted the pay; that she then paid the prisoner $82.75 for the flour, expecting the flour would come soon; that he gave her a receipt for the money; that the flour did not come that night, and never came; that next day she went down to Riegelman's and asked why the flour did not come, and the bookkeeper told her no flour had been ordered for her.

On her *cross-examination*, she stated, among other things, that when she went down to Riegelman's she saw Mr. Riegelman and a clerk, and he said, "I am sorry such a thing has happened to you; so long as we have not the money we cannot send you the flour;" that she had never dealt with Riegelman directly, but always through the prisoner, Smith, who said he was clerk and salesman for Riegelman; that she had previously purchased flour from Riegelman, through Smith, four times; that when she first bought of him, he told her her husband owed him over $100, and she said to him, "if my husband owes you anything and should not come back, I would pay him $5 at a time if I could spare it.

The witness also testified that she had paid Riegelman & Deffaa for all the flour she had previously had of them.

On further *direct examination*, she testified that prisoner said the flour had started from the store of Riegelman & Deffaa, 315 Washington street, when he, prisoner, left the store to

come there, and that he was their clerk; that she had been in business on her own account and with her own capital about six years; that her name is Rachel Stoesser, and her husband's Frederick Stoesser.

Defendant's counsel offered to show that Frederick Stoesser was insolvent, and that the ownership of the store had been frequently transferred by him to the wife, and again by her transferred to him, by conveyances fraudulent as to creditors.

The court refused to permit such testimony to be given, to which refusal counsel for defendant excepted.

*John Riegelman* was then called as a witness on behalf of the prosecution, and testified as follows:

*Q.* You are in business in this city? *A.* Yes, sir.

*Q.* What is your firm? *A.* John Riegelman & Deffaa.

*Q.* Where did you carry on your business? *A.* 315 Washington street.

*Q.* Do you know the prisoner at the bar? *A.* Yes.

*Q.* Do you know Mrs. Stoesser? *A.* Only since this matter has gone on.

*Q.* State whether Smith sent from your store, on or about the 20th of October, any flour for her? *A.* I do not know anything about it.

*Q.* Did any flour ever go from your store? *A.* I don't know anything about this matter.

*Q.* Don't you know whether any flour was sent from your store to this woman on the 21st of October? *A.* I cannot tell; I was not there; I am very seldom in the store.

*Q.* Did you see this woman when she called next day? *A.* I did not.

*Q.* Did you ever see her at all? *A.* The first time I have seen her was in Essex market.

*Q.* Was he a clerk in your store? *A.* He is a salesman on his own account.

*Q.* Was he your salesman? *A.* Yes.

*Q.* When did he become your salesman? *A.* About six months ago.

*Q.* Under a stated salary ? *A.* No, sir.

*Q.* State what the arrangement is. *A.* I give him the flour for so much; he sells on his own account, and has to pay for it.

*Q.* He has an arrangement with you ? *A.* Yes, sir; he must pay for it.

*Q.* That's what you mean by being your clerk ? *A.* Yes, sir.

*Q.* Do you know flour that's sent from your store ? *A.* I do not.

*Q.* Who has charge of that branch of the business? *A.* Our bookkeeper (Rudolph Cameron) and partner.

*Cross-examination:*

*Q.* That is the blotter of Riegelman & Deffaa (showing witness a book) ? *A.* Yes, sir.

*Q.* That last entry on the page is in Smith's handwriting? *A.* I ain't sure of it; I guess our bookkeeper would know.

*Q.* When Smith bought flour of you, to whom did you look for pay ? *A.* To Smith.

*Q.* You did not look to Mrs. Stoesser at all? *A.* No, sir; never do.

*By the court:* Instead of being your salesman, he bought flour of you? *A.* Yes, sir.

*By counsel for defendant:* He had full power to receive the money ? *A.* Yes, sir.

*By district attorney :* Did you sell and charge it to Smith, and look to him for pay? *A.* Yes, sir,

*By counsel for defendant:* He has a right to deliver any flour he likes from your store? *A.* Yes, sir.

*By a juror :* Are these your bills (showing bills)? *A.* They are.

*Rudolph Cameron* was then called as a witness on behalf of the prosecution, and after being duly sworn, testified as follows:

*Q.* Are you in the employ of the firm of Riegelman & Deffaa ? *A.* Yes, sir.

*Q.* Were you on the 28th of October last ? *A.* I was.

*Q.* What is your business there ? *A.* Bookkeeper.

*Q.* Do you know every sale made? *A.* I know in the books, but not in the other book.

*Q.* You take an account of flour shipped from your store? *A.* Yes, sir.

*Q.* And to whom it is shipped? *A.* Yes.

*Q.* Do you know whether, on that day, flour was sent to Mrs. Stoesser? *A.* Some ordered at 32 Delancey street, but it was not sent.

*Q.* Was it not ever sent? *A.* No; not this lot.

*Cross-examination:*

*Q.* You say this flour was ordered, but not sent; state what steps were taken. *A.* Smith came in the evening, and said he did not want to send it; he said he had got some of his old debts.

*Q.* What had been done towards sending this flour; had it been picked out? *A.* It was.

*By the court:* Had this particular flour been ordered? *A.* Yes, sir.

*By counsel for defendant:* These ten barrels of flour had been picked out? *A.* Yes, sir.

*Q.* What directions had been given with regard to sending this flour? *A.* 32 Delancey street.

*Q.* How was it to be sent? *A.* I should send it that afternoon.

*Q.* By the cartman? *A.* Yes, sir.

*Q.* Was the cartman there at the time it was ordered? *A.* No; I guess he was over in Brooklyn; I ain't quite sure.

*Q.* What time did he come back? *A.* Pretty near night.

*Q.* Had Smith got back then? *A.* I guess Smith came back between four and five o'clock.

*Q.* What did he say? *A.* He crossed the bill and said, "Don't send the flour until I get some of my old debts."

*Q.* Look at those marks across the face of the order, and see if these were the marks he made at the time? *A.* Yes, that is his handwriting.

*Q.* Did he state what had happened? *A.* Not at that time, but the day after.

*Q.* Was any one present besides you and Smith? *A.* Mr. Deffaa.

The People *v.* Smith.

*By a juror:* Did you make out the bill ?   *A.* No.

*Q.* Who made it out ?   *A.* That is Smith's handwriting.

The testimony for the prosecution was here closed.

*Christian Spearenburger* was called as a witness on behalf of the defense, and after being duly sworn, testified as follows :

*Q.* Where do you live, and what is your business ?   *A.* I live 63 Market street, and am a cartman.

*Q.* Have you been in the habit of delivering any flour for Julius J. Smith to Mr. and Mrs. Stoesser?   *A.* I have.

*Q.* From what time to what time ?   *A.* From the 26th of December, 1861.   I have taken them the first load up to about, I think it was March.

*Q.* To whom was the flour delivered ?   *A.* To Mrs. R. Stoesser, 32 Delancey street.

*Q.* How many times do you think during that period you delivered flour to her ?

*By court* :   " Concede that she owed him money.   A man can't collect a debt by false pretenses."

*Philip Deffaa,* was then called as a witness on behalf of the defense, and after being duly sworn, testified as follows :

*Q.* You are a member of the firm of Riegelman & Deffaa? *A.* Yes, sir.

*Q.* Do you know Smith at the bar?   *A.* Yes, sir.

*Q.* On the 28th of October, was he employed by you ? *A.* No, sir; he buys the flour of us and sells on his own hook.

*Q.* Did his customers come near you, or did they deal with him ?   *A.* No.   They dealt with him ; he could pick out the flour that he wanted ; his price is made ; we have a certain profit, and he sells the flour.

*Q.* He is authorized to sell flour from your store ?   *A.* He can sell flour from our store when he buys it.

*Q.* He didn't have to pay the money for it, in the first place, before he delivered it ?   *A.* No, sir.

*Q.* Do you remember his ordering flour for Mrs. Stoesser? *A.* He did ; a load of flour ; I believe it was the day before the lady came to the store.

*Q.* Was this flour picked out, so that it could be sent? *A.* Yes, it was on the book.

*Q.* What was the custom with regard to that flour? *A.* Whether Smith would be there or not, the flour would be sent. We had no time to send it. Smith came in and said: " Have you sent this flour?" I says, "I have not." "Very good," said he; "I won't send it." The woman made a statement to me about other flour dealers. I did not take particular notice. I let it go so. The next day or two days after, this old lady came in and asked me whether Smith ordered the flour. I told her "no." I did not want to interfere with the lady. I did not know anything about it, and the flour was not sent. We left the flour in the store.

*Q.* What did the lady say? *A.* She said they owed Smith money, when her husband was there; her husband left her and went away and she cannot pay it — that was in the door of the store.

*Q.* What did you say to Smith at the time he ordered the flour to be stopped?

The district attorney objected to this question. The court sustained the objection and refused to allow the question to be answered; to which decision counsel for defendant excepted.

Counsel for defendant offered to give evidence as to what transpired between the defendant and the witness Deffaa before defendant stopped the flour. The court refused to allow such evidence to be given; to which decision counsel for defendant excepted.

*Q.* Was Smith at this time authorized to receipt your bills? *A.* I do not know; Mr. Riegelman made this arrangement with Smith.

*Q.* Is Smith still with you under the same arrangement? *A.* Yes, he is there to-day.

*Cross-examination:*

*Q.* The flour never left the store, did it? *A.* No, sir.

*By the court:* *Q.* Never was put on the cart? *A.* No, sir; if he got back a little later, it would have been sent.

*By a juror:* *Q.* Look at all these bills; do you know these bills? *A.* I do, sir.

*Q.* Did you authorize Smith to make out that bill? *A.* I find Mr Riegelman made the contract with Smith in the first place.

*Q.* Do you know that handwriting (showing a paper)? *A.* I do not; it must be Smith's; it ain't our bookkeeper's.

*Q.* Do you know whose it is? *A.* I think it is Smith's.

*Q.* Did you authorize Smith to have any of your billheads to make out bills on? *A.* I do not.

*Q.* Do you know whether he has any authority from your partner to do so? *A.* I think he has, for he would not allow him to do so if he had not; that is my opinion.

*By counsel for defendant:* *Q.* Look at that entry; do you know anything about that delivery of flour?

Objected to by the district attorney.

Counsel for defendant proposed to show that the defendant had authority to act as clerk and salesman.

*Witness:* He has authority to send flour, as a matter of course.

*By the court:* *Q.* You sold him all the flour he wanted? *A.* Yes, sir.

*Q.* Is he in your store most of the time? *A.* Sometimes two or three hours; he generally comes there every day; when the lady came in that day he was not there.

Other witnesses were examined on the part of the defense, and after the counsel had addressed the jury,

The court charged the jury as follows, viz.:

By the laws of this State, every person who, with intent to cheat or defraud another, designedly, by any false pretense, obtains from such other any money, personal property or valuable thing, is guilty of a crime, and liable to punishment. In order to convict any one of " obtaining goods by false pretenses," the jury must be satisfied, upon the evidence, that the party accused with intent to cheat and defraud, has made some false representations of some matter of fact to induce the person to whom it is made to part with some property or valuable

thing. The representation must be such as would be likely to be believed and acted on by a person of ordinary caution ; and such person must have parted with his property upon the belief that the representation was true. It is not necessary that all the pretenses charged in the indictment should be proven to be false. It is sufficient ·if any one of them is proven to be false, if such pretense induced or had a material effect in inducing the prosecutor to part with his property.

To the last proposition the defendant's counsel excepted.

The court further charged the jury : That applying these propositions to the present case, if the jury were, upon the evidence, satisfied beyond all reasonable doubt that the defend· ant, with intent to deceive and defraud Mrs. Stoesser, falsely represented to her that he was the clerk of Riegelman & Deffaa, and that the flour which he had in the morning, as such clerk, sold and was to deliver to her, had left the store of Riegelman & Deffaa on the cart at the same time he had left, and was then on its way to her store, and ·that she, relying upon the truth of such representations, at his request gave to him the money for the purpose of paying for the flour, they might convict the defendant.

To which proposition the defendant's counsel excepted.

The court further charged that it was not necessary, in order to justify such conviction, that it should appear that all of such representations were false. It was enough if the falsity of either one of them was established, if each one had a material effect in inducing Mrs. Stoesser to part with her money.

To which proposition defendant's counsel excepted.

The counsel for defendant requested the court to charge the jury, that upon evidence in the case, the defendant was entitled to an acquittal.

The court refused so to charge, and to such refusal defendant's counsel excepted.

The counsel for defendant also requested the court to charge the jury, that a false representation, by which a man may be cheated into doing his duty, is not the subject of punishment under an indictment like this.

The People *v.* Smith.

The court charged that this, as an abstract proposition, was true, and that it had been decided in this State that where one held the promissory note of another, which was due and unpaid, and falsely represented to the debtor that such note was lost or burned, and thereby induced him to pay the same, that such false representation did not render him liable to punishment under the statute relating to obtaining goods by false pretenses.

And upon this point the court further charged, that there was a difference between the case so decided and the case then on trial; that the defendant, if he made the false pretenses before mentioned, and thereby induced the prosecutrix to give him the money for the flour, could not shield himself from criminal responsibility by showing that his secret intention, not communicated to her, was to apply the money to the payment of a debt due or claimed to be due from her to him; that if she had parted with the money to pay the debt, he could not be convicted, no matter how false the representation which induced her to do it; but it was not so if the money was parted with for another purpose, viz., to pay for the flour which he represented was then on its way to her store.

To all which defendant's counsel excepted.

Upon this point, the court, illustrating the same, added as follows: "If the foreman of this jury owed me a debt, and I, being on intimate relations with his family, went to him and falsely told him that his wife had requested me to come to him and ask him to give me for her a certain sum of money, which she wanted to use, and he gave me the money, I could not shield myself from responsibility by showing that it was a trick of mine by which I intended only to get money enough in my hands to pay me what was claimed by me to be justly due me. It would be different if I persuaded him to pay me my debt upon some false statement made by me to him to induce him to do so.

To all which defendant's counsel excepted.

The defendant's counsel also requested the court to charge, that if the jury believed, from the evidence, that defendant

was salesman and agent for Riegelman & Deffaa, and had authority from them to collect and receive money for the ten barrels of flour and one bag of meal, the prisoner must be acquitted.

The court refused so to charge, and defendant's counsel excepted.

The defendant's counsel also requested the court to charge, that if any of the pretenses alleged in the indictment to be false were, in fact, true, the prisoner must be acquitted.

The court refused so to charge, and defendant's counsel excepted.

The defendant's counsel also requested the court to charge, that if the jury find that the prisoner believed any one of such pretenses was true, that he must be acquitted.

The court refused so to charge, and defendant's counsel excepted.

The defendant's counsel also requested the court to charge, that to justify a conviction, the jury must be satisfied, from the case, not only that the pretenses were all untrue, but that the prisoner knew they were all untrue.

The court refused so to charge, and defendant's counsel excepted.

The defendant's counsel also requested the court to charge, that if the prisoner believed that the pretenses by which the complainant was deceived were true, he must be acquitted.

Upon this point the court refused so to charge otherwise than had already been charged, and defendant's counsel excepted.

Defendant's counsel also requested the court to charge, that if the jury believed that Mrs. Stroesser owed Smith $82.75 at the time he obtained the money, he should be acquitted.

The court refused so to charge, and defendant's counsel excepted.

Defendant's counsel also requested the court to charge, that if the jury believed the testimony of Philip Deffaa, they should acquit the prisoner.

The People *v.* Smith.

The court refused so to charge, and defendant's counsel excepted.

Defendant's counsel also requested the court to charge, that if the jury believed the testimony of Randolph Cameron, they should acquit the prisoner.

The court refused so to charge, and defendant's counsel excepted.

Defendant's counsel also requested the court to charge the jury: 1st. That if they believed Smith supposed he was doing a lawful act, he should be acquitted; and, 2d. That if he, by his actions, was endeavoring to collect from Mrs. Stoesser what he supposed to be a just debt, he was entitled to an acquittal.

Upon the several propositions the court refused to charge other than had already been charged, and to which refusal on each proposition defendant's counsel excepted.

The jury rendered a verdict of guilty.

The proceedings were then removed by *certiorari* into this court, for review.

*Henry L. Clinton*, for the prisoner.

I. The court below erred in charging the jury "that the defendant, if he made the false pretenses before mentioned, and thereby induced the prosecutrix to give him the money for the flour, could not shield himself from criminal responsibility by showing that his secret intention, not communicated to her, was to apply the money to the payment of a debt due, or claimed to be due, from her to him. That if she (prosecutrix) had parted with the money to pay the debt, he could not be convicted, no matter how false the representation which induced her to do it; but it was not so, if the money was parted with for another purpose, viz., to pay for the flour, which he represented was then on the way to her store."

II. The court below erred in the following portion of its charge to the jury: Upon this point (as stated in Point I), the court, illustrating the same, added as follows: "If the foreman of this jury owed me a debt, and I, being on intimate relations

with his family, went to him and falsely told him that his wife had requested me to come to him and ask him to give me for her a certain sum of money which she wanted to use, and he gave me the money, I could not shield myself from responsibility by showing that it was a trick of mine, by which I intended only to get money enough in my hands to pay me what was claimed by me to be justly due me."

III. The court below erred in refusing to charge, as requested by defendant's counsel, "that if the jury believed that Mrs. Stoesser owed Smith $82.70 at the time he obtained the money, he should be acquitted."

IV. The court below erred in refusing to charge as requested by defendant's counsel, "that if he (defendant), by his actions, was endeavoring to collect from Mrs. Stoesser what he supposed to be a just debt, he was entitled to an acquittal."

Points I, II, III, IV, may be discussed together, as the errors of the court below, specified in these points, were based upon a misapprehension of a single principle of law, to wit: That if defendant, in the representations to the prosecutrix, alleged to have been made by him to her, intended merely to collect a debt due him, or which he believed to be due him, instead of designing to cheat and defraud her, he was not guilty of the offense of obtaining money by false pretenses, even if (which was not the case) his representations as to facts were designedly false.

The language of the statute is, "Every person who, with intent to cheat or defraud another (not with intent to collect his own debt), shall designedly " * * * " by any false pretense" * * * " obtain from any person, any money," &c. It is the intent to cheat and defraud which forms the chief ingredient of the offense. Without this intent there can be no offense. It is not enough if the prosecutor should be incidentally defrauded (which was not the case with the prosecutrix in the case at bar). Roscoe, in his Criminal Evidence, page 478, well observes: "The primary intent must be to cheat and defraud. Thus, where the prisoner was indicted for having procured from the overseer of a parish, from which he

received parochial relief, a pair of shoes by falsely pretending that he could not go to work because he had no shoes, when he had really a sufficient pair of shoes; and it appeared in evidence, that on the overseer bidding him go to work, he said he could not because he had no shoes, upon which the overseer supplied him with a pair of shoes, whereas the prisoner had a pair before; the prisoner being convicted, the case was considered by the judges, who held that it was not within the act (30 *Geo. III, ch.* 24), the statement made by the prisoner being rather a false excuse for not working, than a false pretense to obtain goods." (*Wakeling's Case, Russ. & Ry.,* 504.)

A. owed B. a debt, of which B. could not obtain payment. C., a servant of B., went to A.'s wife and got ten sacks of malt from her, saying that B. had bought them of A., which he knew to be false, and took the malt to his master in order to enable him to pay himself; it was held by COLERIDGE, J., that if C. did not intend to defraud A., but only to put it in his master's power to compel A. to pay him a just debt, he could not be convicted of obtaining the malt by false pretenses. (*Williams' Case,* 7 *Car. & Payne R.,* 354.)

The above case cited by Roscoe (*p.* 475), with approbation, and approved by the Supreme Court at general term, in *People* v. *Griffin* (2 *Barb. R.,* 431), is in harmony with all the authorities on this subject.

If the intent be to collect a debt due or supposed to be due, it is absurd to say that the intent is to cheat and defraud. This principle underlies all the authorities.

In the case of *The People* v. *Griffin* (2 *Barb. R.,* 427), the defendant was convicted upon an indictment charging him with having written letters to one Heath, threatening to burn and destroy his property, unless he would send defendant the sum of sixteen dollars claimed by defendant to be due from Heath. The court below, in that case (as did the court below in this case), thought that the fact of whether the prosecutor was indebted to the defendant was entirely immaterial. The court charged that it was entirely immaterial whether Heath owed him the money claimed or not. The Supreme Court

granted a new trial, holding that the charge of the court, as given, was erroneous. The court, per WELLES, J. (*pp.* 429, 430), observe: "In order to constitute the offense created by this statute, the letters must be sent, &c., with a view or intent to extort or gain money or property, &c., belonging to another. The intent must be to extort or gain. Can it be truly said that a person extorts money which is justly his due?" [Can it be truly said that a defendant cheats or defrauds another, by obtaining from that other, even though he make false representations, that which is justly his (defendant's) due? The defendant, Smith, merely sought to obtain from the prosecutrix that which she owed him. There could be no such thing as defrauding her into the payment of a debt in this way. The defendant's object was not to cheat or defraud, but to get that which was honestly his due.] Justice WELLES (*p.* 430), further observes: "In view of the well established rule, that penal statutes are to receive a strict construction, I must interpret this as intending to embrace only cases where the intent is to obtain that which, in justice and equity, the party is not entitled to receive. The end, as well as the means employed to obtain it, must be wrongful and unlawful." This language is entirely applicable to the case at bar. The money to pay his debt, Smith was entitled, "in justice and equity," to receive. The end, to wit, the collection of his debt, was certainly not wrongful or unlawful. Justice WELLES continues to illustrate this doctrine, well and forcibly, as follows: "If A. meets B. in the highway, and by threatening his life, induces B., through fear, to surrender his watch or horse to A., this is robbery. If, in the case supposed, B. defends himself or escapes and retains his property, A. is guilty of an attempt to rob. If, however, in either case, A. is able to satisfy the jury that he believed the property to be his, and that he was obtaining, or attempting to obtain what he honestly supposed belonged to him, although, in fact, his claim was not legal, and the property really belonged to B., he should be acquitted. So, in the case of larceny, if the defendant can show he took the goods alleged to be stolen, under a

*bona fide* claim of right, the case becomes a mere trespass. In all these cases, the fraudulent intent is the essence of the offense."

The following cases are illustrations of the principle that the end had in view, as well as the means of accomplishing it, must be unlawful in order to constitute this offense.

In *People* v. *Thomas* (3 *Hill R.*, 169), the defendant falsely represented to one Jones, against whom he held a promissory note, that it had been lost or burned, and thereby induced Jones to pay it. Afterward, the defendant negotiated the note to another person for value, without apprising him that it had been paid. The court held the conviction wrong, on the ground that Jones had not been defrauded. The defendant, Thomas, by false representations and by artifice, had obtained payment of his debt. In the case at bar, Smith, even assuming that he falsely represented that the flour and meal were on the cart, merely obtained payment, or rather part payment of a debt which was due, or which he believed due, from the prosecutrix.

In the case of *The People* v. *Williams* (4 *Hill R.*, 9), the indictment charged that the defendant falsely pretended to Van Gilder that one Gray was about to sue him on a bond which he, the said Gray, then held and owned against Van Gilder, and that the said Gray was about to foreclose a certain mortgage which he then held and owned, and by such false pretenses obtained the signature of Van Gilder to a deed of lands. Although the facts were proved as stated in the indictment, the court held that the prisoner had committed no offense, and ordered a new trial.

The principle underlying these, as well as all the authorities on the subject, is, that if the intent be to collect a debt existing, or supposed to exist, there being in such case an absence of intent to cheat or defraud, or if the false representation or pretense be such that no legal injury can result, there is no criminal offense.

V. The court below erred in refusing to charge the jury as

requested by defendant's counsel, that upon the evidence in the case the defendant was entitled to an acquittal.

The chief representations averred in the indictment to have been *false*, to wit, that defendant represented that he was clerk and agent of Riegelman & Deffaa, and had authority to collect the money, were proved on the trial to have been *true*.

In the case at bar the only representation claimed to have been made by defendant that was not proven to have been *true*, that the flour was on the cart, leaving the prosecutrix to infer that it was on its way to her, was entirely *immaterial*, for Smith could just as well have stopped the cartman of Riegelman & Deffaa on the route to the prosecutrix, as to countermand the order. The "*material* thing" was that the flour had· been *ordered;* and this representation was *true*. (*Ranney* v. *The People*, 22 *N. Y. R.*, 413.)

Upon the facts and circumstances proved in the case, assuming everything testified against the prisoner to have been true, the testimony was not capable of any legal construction which could impute the offense of false pretenses to the prisoner. Upon the undisputed facts, the evidence of the prosecution — the whole evidence — the defendant was clearly entitled as matter of law to an acquittal, and the court below should have so charged the jury.

VI. The court below erred in refusing to allow the witness Deffaa to state what he (the witness) said to defendant at the time defendant ordered the flour to be stopped. To which defendant excepted. Also in refusing to allow the defendant to prove what transpired between him and the witness Deffaa before he stopped the flour. To which defendant excepted.

If defendant had committed any offense, it would have been *complete* at the time he obtained the money. (*See People* v. *Genung*, 11 *Wend. R.*, 18.) The court held that the offense (obtaining a signature by false pretenses) was complete when· the signature was obtained. JEWETT, J., in *People* v. *Crissie* (4 *Denio R.*, 427), says that the Supreme Court has often held " that the offense is *complete* when a party has been induced, by a pretense within the statute, to affix his signature to an

The People *v.* Smith.

instrument," &c. If Smith did not entertain an intent to cheat and defraud *when he obtained the money,* no offense could be predicated upon an intent formed *afterwards.*

The proposed evidence was also competent as forming a part of the *res gesta.* The prosecution had proved the fact that Smith did not send the flour, that he countermanded the order, clearly what he had said to Deffaa, and what Deffaa said to him, constituting the transaction, was admissible as forming the *res gesta.*

The very definition of *res gesta* applies to the proposed evidence. In 1 *Phillips' Ev.,* 194, the author says: "*Words* and writings appear, perhaps, more properly to be admissible as part of the *res gesta,* when they accompany some act, *the nature and object, or motive of which are the subject of inquiry.*"

VII. The court below erred in refusing to allow defendant to show that "Frederick Stoesser (the husband of prosecutrix) was insolvent, and that the ownership of the store had been frequently transferred by him to his wife, and again by her transferred to him by conveyances fraudulent as to creditors."

The prosecutrix having testified, on her direct examination, that she carried on business at 32 Delancey street, six years, and having also testified, under defendant's objection, that at the time Smith sold to *her* flour, her *husband* carried on the business, the testimony proposed was competent, 1st. For the purpose of contradicting, on cross-examination, what she had testified to on the *direct* on this subject; 2d. As tending to show that her indebtedness to defendant was fraudulently incurred; 3d. As bearing on the question of the absence of any intent, in law or in point of fact, on the part of defendant to defraud the prosecutrix.

VIII. The indictment in this case is fatally defective, for the reason that there is no sufficient description of property alleged to have been obtained by false pretenses. The judgment should, therefore, be arrested.

In an indictment for false pretenses, the description of the property obtained must be as particular and specific as in cases

of larceny. (*Whar. Cr. L.*, 4*th ed.*, § 2155; 3 *Chitty Cr. L.*, 947; *Conger's Case*, 4 *City Hall Recorder*, 65.)

An indictment describing the things stolen as " three dollars in divers pieces of silver current in this State, and of the lawful value of three dollars, is bad, on error." (*Lord* v. *State*, 20 *N. H. R.*, 404.)

The court, *per* GILCHRIST, J., in this case (*p.* 405), say: " The indictment should contain a description of the pieces of silver stolen. In *Rex* v. *Frey* (*cited in Russell on Crimes*, 109), it was held that " ten pounds in moneys numbered was bad upon a motion in arrest of judgment."

In this State, in the county of Carroll, it has lately been held that " sundry pieces of silver coin, current by law, within this State, amounting together to the sum of twelve dollars of the goods, chattels and moneys of," &c., was an insufficient description of property alleged to have been stolen. The authorities show that a defect of this kind is not cured by a verdict, and by reason of it, the judgment must be reversed; and it is unnecessary to inquire into the other ground of error."

Where a person was indicted for stealing three eggs of the value of two pence, TINDALL, C. J., held the indictment to be bad, for not stating what sort of eggs they were; for all that appeared in the indictment they might be adder's eggs, or other eggs which could not be the subject of larceny.

Defective descriptions of the offense charged (the description of property is a material part of the description of the offense) is not one of the points in which an indictment is cured by verdict, but the same is equally fatal upon a motion in arrest of judgment, as upon demurrer or a motion to quash. (*State* v. *Gore*, 34 *N. H. R.*, 510.)

From these authorities it is clear that the indictment is fatally defective.

*A. Oakey Hall* (District Attorney), for the People.

I. The question, " who was carrying on the business," was properly admitted against the prisoner, because — as his whole cross-examination shows — he had opened the inquiry. It

The People *v.* Smith.

was probably an irrelevant matter, but prisoner could not object to its being followed up on his beginnings. But the People are unable to discover how, in any event, the answer prejudiced him.

II. The offers, to show that the husband of the prosecutrix was insolvent, and that he and she had defrauded creditors, were properly refused.

Because the evidence included by the offers was irrelevant. (*Elementary Law of Evidence, passim.*)

III. The conversation between prisoner and Deffaa were properly excluded.

They were liable to the reasons given in *People* v. *Wiley* (3 *Hill R.*, 211), for excluding naked declarations in a prisoner's favor; and they were, as regards the People or the prosecutrix, *res inter alios.*

IV. The court properly excluded an offer to impeach complainant. The facts sought after were collateral. Moreover, the evidence offered was not of a competent or appropriate character.

V. The court correctly charged on the subject of false pretenses in cheating a man into his duty — as the prisoner's phrase was.

The facts at bar did not warrant the request to charge, even if that request was correct in law. There is nothing in the case to show that Mrs. Stoesser owed prisoner anything, were the fact admissible. So far from that, it appears by affirmative inference that the prisoner had made an assignment. Moreover, the evidence seems to show that Smith formed the intention of pocketing the money and applying it to his debt. after the false pretense had been used and his design accomplished.

If the doctrine contended for by the prisoner was tenable, then disputed claims could be collected by telling ingenious lies in the manner confessedly practiced by the prisoner.

The case of *People* v. *Thomas* (3 *Hill R.*, 170), so relied upon by prisoner, was decided upon the insufficiency of the indictment. It is evident, from reading the reported case; that

if the maker of the note had been compelled to pay the note a second time, he (the maker) *would* have been defrauded.

VI. The allegation of obtaining "*money*," which is in the indictment, is sufficient.

An objection to the sufficiency of such pleading, in the case of *People* v. *Niles*, was taken by the late David Graham, but the objection was overruled in both Supreme Court and Court of Appeals, and the point is *res adjudicata.* (*See Indictment and Points in the Niles case; and MSS. reasons for no opinion having been published.*)

CLERKE, J. For the purpose of determining the question involved in this case, I will assume that Mrs. Stoesser was indebted to Smith in the amount which he obtained from her on the 28th of October, 1862. The question, then, is, if by means of false representations or pretenses, by which a creditor makes his debtor believe that the debtor shall receive a new and valuable consideration, and induces the debtor to part with money therefor — the creditor, at the time he takes the money, intending not to give the new consideration, and, accordingly, never giving the debtor the new consideration, but applying the money, as he intended to apply it at the time he received it, to the payment of the old debt — is he guilty of the legal offense of obtaining property by false pretenses?

The counsel for the accused refers to two cases which would seem to sustain the negative of this proposition: the one, *Williams' Case* (7 *Carr. & Payne*, 354); the other, *The People* v. *Griffin* (2 *Barb. R.*, 431). The first of these cases was tried at the Brecon Assizes, before Mr. Justice COLERIDGE and a jury. The circumstances were these: A. owed B. a debt, of which B. could not get payment. C., a servant of B., went to A.'s wife and obtained two sacks of malt of her, saying that B. had bought them of A. C. knew this to be false, but took the malt to B., his master, to enable him to pay himself the debt. Mr. Justice COLERIDGE told the jury, if they were satisfied that C. did not intend to defraud A., but only to put it in his master's power to compel him to pay a just debt, it would be

The People *v.* Smith.

their duty to find him not guilty. It is not sufficient, he added, that the prisoner knowingly stated that which was false, and thereby obtained the malt; they must be satisfied that the prisoner, at the time, intended to defraud A. The jury rendered a verdict of not guilty. In the other case to which the counsel of the accused has referred, the defendant was convicted upon an indictment charging him with having written letters to one Heath, threatening to burn and destroy his property unless he would send the defendant the sum of sixteen dollars, claimed by defendant to be due to him from Heath. The court below thought that the fact of the indebtedness of Heath was entirely immaterial, and so charged the jury. The Supreme Court, at the Cayuga General Term, January, 1848, granted a new trial, holding that the charge was erroneous; Mr. Justice WELLES, in delivering the opinion of a majority of the court, observing: "In order to constitute the offense created by statute, the letters must be sent with a view to extort or gain money or property belonging to another. The intent must be to extort or gain. Can it be truly said that a person extorts money which is justly due?"

Considering the sources from which these decisions have come, they are undoubtedly entitled to respectful consideration. But they appear to me so entirely at variance with the well-known policy of the law, that I cannot regard them as of controlling authority in this case. That policy is, not to give any man the right of self-redress, except in the well-known instances of self-defense, recaption or reprisals, entry on lands and tenements, when another person has, without any right, taken possession thereof, and abatement of nuisances. In the two instances of self-redress which relate to the repossession of property, the law limits the right only to cases where it can be exercised without force or terror or any breach of the peace. Otherwise, this right would be inconsistent with the peace and good order of society, which it is one of the principal purposes of the law to encourage and support. If every man were allowed to redress himself by force and violence, society would fall back into that condition which characterized it before it

emerged from the barbarism of the dark and middle ages, when every man and every family undertook to avenge themselves, and the land "was filled with violence." Instead of the peaceful administration of justice by impartial tribunals, feuds and factions, transmitted from generation to generation, would obstruct all industry, and render any progress in wealth, refinement or the arts of life impossible. In the same way, and for reasons equally important, the law discourages the employment of fraud or falsehood in the endeavor to obtain redress. Although there are some duties, such as truth, which are termed duties of imperfect obligation, which the law does not undertake to enforce, yet it will never encourage the violation of any of these duties by sanctioning their violation, even in the endeavor to accomplish a lawful end. This would be legalizing the profligate doctrine that the end sanctifies the means — a doctrine not only abhorrent to conscience and the Divine law, but at variance with the principles of municipal law, of which the object is not only to preserve society from open violence, but to discountenance everything that is calculated to encourage artifice and dishonesty in the intercourse of men with each other. If it is wise to forbid men from using force to collect a debt, it is equally wise to forbid them from using fraud to collect it. If strife is not the immediate consequence of the latter, it will, if generally sanctioned, lead to it. It will, at all events, inevitably breed imposture and falsehood, which are quite as pernicious to the best and highest interests of society as violence. Besides, is it to be taken for granted that debtors have no rights? Is it enough for a man to say that another is his debtor? The latter may, as, indeed, in the case before us, have a defense to the claim, the sufficiency of which can be properly determined only by the tribunals appointed by the law to ascertain the truth. It would be unjust, by sanctioning a trick, to deprive an alleged debtor of the attitude in which he stands, and allow his alleged creditor to recover his demand without requiring him to prove it where it is disputed, and giving the former an opportunity of substantiating his defense.

The People *v.* Smith.

This is the result which such a practice would undoubtedly produce; and though injured creditors may, by such means, occasionally obtain their rights, many debtors would be deprived of their rights. So that where it is said, in the cases above quoted, that " the defendant's object was not to cheat or defraud, but to get that which was honestly his due," this is not the question, but the proper consideration is, is it safe to allow every man to be a judge in his own cause, and, in officiating in that capacity, to allow him to resort to false pretenses to accomplish his purpose? If a person having, or pretending to have, a claim against another, is allowed to do what in any other case would render him liable to punishment for obtaining goods under false pretenses, why should he not also be allowed to do what, if he had not such a claim, would render him liable to punishment for the crime of larceny ? Would the law, for instance, recognize his right to take money furtively out of the desk of his alleged debtor, and apply it to the payment of his debt ? He has the opportunity, without force, of doing this, and in the language employed by the court, in *The People* v. *Griffin*, " his object is not to cheat or defraud, but to get that which is honestly his due." The intent would be precisely the same as in the case before us, and the only difference would be, that in the one case he obtained money by means which the law, in ordinary cases, calls false pretenses, while in the case I have been supposing, he would obtain it by means which the law, in ordinary cases, calls larceny. But I think he would be convicted of larceny in this supposed case.

The case of *The People* v. *Thomas* (3 *Hill R.*, 169), though going very far, does not sustain the principle asserted by the counsel for the accused. In that case there was a misrepresentation as to the loss or destruction of the note. The note was due, and the maker was willing and ready to pay it. On paying his money he knew that it was to be appropriated to the payment of the note. He was not induced by the misrepresentation to give it for any other purpose, on the promise that he was to get another consideration for it. It did not

appear from the indictment that Jones sustained any damage by the false representation. The case turned upon the sufficiency of the indictment. Whether the maker of the note would or would not be injured by any subsequent disposition of the note, was purely speculative.

I think the recorder fairly and clearly presented the true question to the jury, and properly refused to charge as the prisoner's counsel requested.

The objections taken to the indictment and the rulings on the evidence are equally untenable.

The conviction should be affirmed, and the Sessions directed to proceed to judgment.

Justice BARNARD concurred.

SUTHERLAND, P. J. (dissenting). The question in this case is not one of morals, but of crime. The prisoner was indicted in the New York General Sessions, for obtaining from one Rachael Stoesser the sum of $82.70 in money by false pretenses. The crime is statutory. The words of the statute are: "Every person who, *with intent to cheat or defraud* another shall designedly," &c.

Assuming that the pretenses or representations set forth in the indictment, were shown to have been designedly made, and to have been false, the question presented by the exceptions to the recorder's charge is, could the prisoner be legally and properly convicted, if the false representations were made and the money thereby obtained, with the intent to apply or credit the same on a just debt, then due and owing from Rachael Stoesser to the prisoner? In other words, the question presented by the recorder's charge, and the exceptions to it, is, could the prisoner be lawfully convicted if he used the false and fraudulent means charged in the indictment, for the purpose of obtaining the payment of a just debt, due and owing to him from Mrs. Stoesser? If, when the money was obtained the prisoner intended to apply it on a just debt, due to him from her, can it be said that he intended to *cheat or defraud her* out of the money? I think not. To complete the statutory crime, the means, the pretenses or representations

must not only be false and made designedly, but they must also be made with à particular intent, to wit, to cheat or defraud another.

In equity a debtor's money belongs to his creditors. It is a maxim of equity that a debtor must be just even before he is generous.

If Mrs. Stoesser's money went to pay a just debt of hers, it went where it ought to have gone. If the prisoner obtained the money by lying designedly by means of the false representations charged in the indictment, he was guilty of a moral delinquency, of fraud or deceit, if you choose to say so, shocking to the moral sense; but if he resorted to this foul means merely for the purpose of procuring payment of an honest debt, I do not see how it can be said that he intended to defraud Mrs. Stoesser out of her money. If such was his intention, all you can say is, that by lying, without any personal violence or breach of the peace, he obtained what belonged to him. If such was his intention, he was not guilty of the crime defined by statute, although he may have perpetrated a gross fraud. If one citizen can, without going to law, procure from another citizen what justly belongs to the first citizen, without any breach of the peace or injury to the public, that is, by any means not criminal, I do not see why he cannot do it without being guilty of any crime.

These are my views of the question irrespective of cases, but the case in 7 *Carr. & Payne,* referred to by Mr. Justice CLERKE in his opinion in this case, appears to be in point, and to tend to the same conclusion; and I do not see why it should be disregarded.

If Mrs. Stoesser was indebted to the prisoner at the time he obtained the money, in an amount larger than the sum obtained, it does not follow that his intention, at the time he obtained the money, was to procure the payment, or part payment of that debt. His applying the money on the debt may have proceeded from an afterthought.

With the other questions in the case, I think the recorder should have submitted to the jury the questions as to the fact

or existence of the indebtedness of Mrs. Stoesser to the pris-
oner, and as to the intention, and should have charged the
jury, that if they found that Mrs. Stoesser was, at the time,
&c., indebted to the prisoner in an amount equal to or greater
than the sum of money obtained, and also found that the pris-
oner, when he made the false representations and obtained the
money, intended to apply it on such debt, and did subsequently
so apply it or credit it, that they must acquit, however false or
designed the representations by the prisoner may have been.

My conclusion is, that the conviction of the prisoner should
be reversed, and that a new trial should be ordered.

<div style="text-align: right">Judgment affirmed.</div>

---

SUPREME COURT.    New York Special Term, February, 1861.
Before *Leonard*, Justice.