## WOODRUFF *v.* STATE.

Opinion delivered July 15, 1895.

FALSE PRETENSES—OBTAINING SIGNATURES TO WRITTEN INSTRU-
MENT.—Act April 5, 1887, creating the state debt board, as amended by act April 9, 1889, authorized the state treasurer, under direction of such board, to exchange certificates of indebtedness for valid bonds and matured coupons of the state provided, however, that coupons, not attached to bonds should not be exchanged unless the bonds had been redeemed. Under a rule of the board, bonds and coupons tendered for exchange were required to be filed with the treasurer, and, at the next meeting of the board, the treasurer was required to present such bonds and coupons for inspection by the board, whereupon, if found correct, a written order was made and signed by the members of the board, authorizing and directing the treasurer to make the exchange. *Held,* that an indictment charging the state treasurer with obtaining

the signatures of all the members of the board to such an order by falsely pretending that the bonds to which the coupons tendered in exchange belonged had been redeemed, and that thereupon the order was delivered to the defendant, charges the offense of false pretenses, under Sand. & H. Dig. sec. 1573, providing that "every person who * * shall, * * by any false pretense, obtain a signature of any person to any written instrument, * * shall be deemed guilty of larceny and punished accordingly."

EVIDENCE—PROOF OF GENERAL BALANCE OF ACCOUNT.—It is competent for witnesses who have in an official capacity inspected the accounts of a state treasurer in his dealings with the state, and made written reports of their investigations, to testify as to a general balance of his accounts with the state, especially where their evidence is the result of voluminous facts, and of the inspection of many books and papers, the examination of which could not conveniently take place in court, and where, too, the treasurer was party to the proceedings in which the investigations was made, and had ample time to inspect the reports, and might by cross-examination have tested the accuracy of the statements made by the witnesses.

WITNESS—REFRESHING MEMORY.—A witness may testify as to facts disclosed by memoranda made by him at the time the transactions to which they referred took place, if they truly represent the transactions, although he relies upon such memoranda for his statements, and not on present recollection.

PUBLIC DOCUMENT—LOSS—SECONDARY EVIDENCE.—Upon proof that a report of the state debt board has been lost, a copy of it, embodied in the original journal of the senate, may be read in evidence.

EVIDENCE—DEPOSITION IN ANOTHER CASE.—A deposition taken in a civil cause between the same parties is not admissible on behalf of the defendant in a criminal cause by reason of the fact that deponent was summoned as a witness in the latter cause, and is dead.

REMARKS OF COUNSEL—WHEN NOT PREJUDICIAL.—A statement by the prosecuting attorney, made in the prosecution of a state treasurer for an offense connected with public revenues, that he had requested the attorney-general to assist him in the trial because the case was one of special interest to every taxpayer is not prejudicial.

SAME—PRESUMPTION AS TO ACTION OF LOWER COURT.—Where a remark of the attorney general, to which objection was taken, as copied into the record, is incomplete and unintelligible, it will be presumed that the objection was properly overruled.

FALSE PRETENSES—INSTRUCTION.—On a prosecution of a state treasurer for obtaining an order of the state debt board for exchange of state certificates of indebtedness for coupons by falsely pretending that the bonds from which the coupons were clipped had been redeemed, an instruction that defendant was not guilty if he owned the coupons or held them for another was properly refused. (BATTLE, J., dissenting.)

SAME—SUFFICIENCY OF PROOF.—On an indictment for obtaining certificates of indebtedness by falsely representing that the coupons exchanged for them were clipped from bonds which had been redeemed, proof that the representations were false as to any one of the coupons so exchanged was sufficient.

SAME—INTENT TO DEFRAUD.—Where an indictment charged that defendant, with intent to defraud the state, procured an order from the state debt board for the exchange of coupons for state certificates of indebtedness by falsely pretending that the bonds from which the coupons were cut had been redeemed, an instruction which made defendant's knowledge that such bonds had not been redeemed proof of his intent to defraud the state is erroneous.

Appeal from Perry Circuit Court.

ROBERT J. LEA, Judge.

*Dan W. Jones, J. E. London, J. F. Sellers, G. W. Murphy* and *T. M. Seawell,* for appellant.

1. The indictment is insufficient, because (*a*) it is not in the words of the statute, or their equivalent. The statute uses the words *designedly obtain;* the indictment charges "did *fraudulently and feloniously obtain,*" etc. The obtaining must be *designedly* and not fraudulently and feloniously. 2 Whart. Cr. Law, p. 631; 26 Am. St. 789. (*b*) The indictment should allege that the coupons or receipt were delivered to the board, and that the order was delivered to defendant in exchange for said coupons or receipts. 90 Ind. 504; 103 Ind. 235; 71 Mich. 296; 63 Mo. 484; 10 Metc. 521; 31 Me. 401. (*c*) The indictment does not allege the duty of defendant to receive the coupons to be exchanged for certificates, nor did it allege his duty to present them to the board for exchange. 64 Ind. 498. It must contain all facts and

circumstances necessary to be proved. 13 Wend. (N. Y.), 311. (*d.*) The order, as described, is an instrument unknown to the law. It does not show on its face its validity from a commercial or legal standpoint. 34 Vt. 502 ; 109 Ind. 407.

2.  It was error to refuse the 2d prayer for defendant. 76 Mo. 180. If defendant was the owner of coupons, he could not be convicted, no matter what representations he made. 3 Hill (N. Y.), 179. The signatures of *all* the members of the board were necessary to make the order valid. A majority could not act. There is no law authorizing such an order. The order was not the subject of forgery, and was of no validity. 75 Ind. 553 ; 20 Atl. 753 ; 13 S. W. 827 ; 5 Neb. 174 ; 25 Ark. 263 ; 34 Mich. 80 ; 34 Vt. 502 ; 109 Ind. 407 ; 29 Am. Rep. 25 ; 55 *id.* 475. The writing should have been set out in the indictment. 7 S. W. 534 ; 24 Tex. App. 132 ; 25 *id.* 451–74. The name of Johnson L. Jones cuts no figure, even if fictitious, as the coupons were payable to bearer. Wash. Man. Cr. Law, p. 39. The indictment did not charge that Johnson L. Jones, and John L. Jones were the same party, and it could not be proved. 32 Ark. 609 ; 65 Mo. 490 ; 61 Ala. 448 ; 14 Tex. 332. A *specific intent* to defraud was necessary. 76 Mo. 180 ; 54 Ark. 489. The materiality and influence of the pretense was a question for the jury. 34 N. Y. 351 ; 14 Ill. 348. The status of defendant's account was not admissible, and the evidence of such was incompetent and tended to prejudice the jury. 13 Wend. (N. Y.), 311. The representations must be false as to *all* the coupons, and not one or more. 7 Allen, 548 ; 33 Tex. 162 ; 31 Ind. 514 ; 30 Ala. 9 ; 31 Ind. 519. The court erred in presuming an intent to defraud. 54 Ark. 497 ; 76 Mo. 180.

3.  Eagle's testimony was improperly admitted; also Chism's. The report of the board was the best evidence. 55 Ark. 221 ; 33 *id.* 833. The opinions of wit-

nesses not admissible.  29 Ark. 448; 58 *id.* 396.  The record is the best and only evidence as to the status of defendant's accounts.

4.  Hudson's and DeWoody's evidence should have been excluded.  1 Gr. Ev. (Redf. ed.) sec. 436.

5.  The testimony of Simms was not competent. The record was the best evidence.  55 Ark 221; 33 Ark. 833.

6.  The deposition of Bell was competent.  42 Ark. 285-8; Gr. Ev. vol. 1, sec. 154; 45 Mo. 267; 60 *id.* 365.

7.  The statements of the prosecuting attorney were prejudicial.  16 U. S. 119; 58 Ark. 474; 150 U. S. 76.

8.  The evidence does not sustain the verdict.

9.  A cheating by which a party only gets a different kind of security, or the satisfaction of indebtedness, is not a violation of law, no matter what pretense is made.  3 Hill, 769; 37 Ark. 445; 7 Am. & Eng. Enc. Law, p. 712, note 8, p. 713.

10.  A falsehood does not necessarily imply an intent to defraud.  2 Bish. Cr. Law, sec. 380; 14 Iowa, 412; 6 Mich. 496.  In this case no injury was done.  55 Ark. 244; 15 N. W. 298.

*E. B. Kinsworthy*, Attorney General, for appellee.

1.  The demurrer was properly overruled.  115 Mass. 481; 35 N. J. L. 445; 9 Col. 470; 101 N. C. 741; 83 N. Y. 436.  The act provides that *every person who obtains a signature * * to any written instrument*, etc., shall be guilty, etc.  The order was of value. Sand. & H. Dig. secs. 1573, 1697.  It was assignable. *Ib.* secs. 489, 5623.  Being assignable, it was of value. 35 N. J. L. 449, 454; 3 Hill, 211.  The order could have been forged.  Sand. & H. Dig. 1595, 1610; 18 S. W. 833; 12 *id.* 264; 1 *id.* 886; 12 *id.* 595; 26 *id.* 78; 5 Ark. 349; 51 *id.* 88.

2. Some of the instructions asked by appellant correctly state the law; but the court covered these in others given, and it was needless to repeat them. 46 Ark. 11; 52 id. 180; 53 id. 117; 50 id. 545. As each coupon was for an amount greater than $10, there could be no petit larceny. 50 Ark. 506. It was as much a crime to secure the signature of one member of the board as it was to falsely secure the signature of all. 7 S. E. 723; 69 N. C. 313; Sand. & H. Dig. sec. 2276; 45 Ark. 452. When sec. 1573, Sand. & H. Dig., was passed, larceny was a misdemeanor, but the law was afterwards amended, making two grades ; and the acts on this subject are to be construed together, as if passed at the same time. Suth. St. Const. sec. 142; 23 Am. & Eng. Enc. Law, p. 311; 4 Ark. 410; 45 id. 391; Bish. St. Cr. 113b.

3. Any writings used by the defendant for the purpose of effecting the fraud, or connected with it in any way, were admissible in evidence. 7 Am. & Eng. Enc. Law, 784, and authorities cited.

4. The testimony of Eagle and Chism was admissible to show how they were misled and induced to sign the order. 83 N. Y. 447; Underhill on Ev. p. 209; 7 A. & E. Enc. Law, 786, and authorities.

5. Appellant testified that he was not short in his coupon account, and introduced evidence to sustain him, and it was proper for the state to show that he was short, for two reasons: (1) To rebut appellant's evidence, and (2) to show that the coupons exchanged were the property of the state.

6. The testimony of Dewoody and Hudson was competent and admissible to show that the coupons belonged to the state, and were clipped from bonds not redeemed.

7. Bell's deposition not admissible. 47 Hun, 18; 80 Cal. 82; 36 Pac. 73; 40 N. W. 228; 33 N. W. 657;

1 Gr. Ev. secs. 163–4 ; 3 *id.* sec. 11 ; 5 Am. & Eng. Enc. Law, 621 ; 60 Ark. 503.

8. Remarks of counsel not reversible error. 24 S. W. 420; 20 *id.* 547 ; 23 *id.* 793 ; 36 Pac. 472 ; 25 S. W. 634 ; 34 Ark. 650. Appellant was not injured. 32 N. E. 431 ; 25 S. W. 634 ; 22 *id.* 157 ; Thomps. Trials, sec. 951.

9. The judge was not absent during the trial. No harm is shown, and there is no error. 18 S. E. 536 ; 81 Ga. 301.

10. The evidence is ample to sustain the verdict. 9 Col. 458 ; 70 Cal. 116. A false pretense may be made by act as well as word. Clark's Cr. Law, pp. 280 to 283 ; 22 S. W. 217 ; 98 N. C. 696 ; 2 Whart. Cr. Law, sec. 2113 ; 60 Ind. 447 ; 36 Mass. 179. The false pretenses need not be the sole cause for signing the order. 59 Ark. 375; 69 Ala. 242 ; 14 Wend. (N. Y.), 546, 555 ; 49 Mich. 12. The intent can be inferred from the acts of the accused. 66 Iowa, 634 ; 6 Mich. 496. False pretenses to an agent are sufficient. 48 Mass. 463 ; 9 Col. 458. Where the signatures were obtained with intent to defraud, the offense was complete. 30 Ind. 350 ; 7 A. & E. Enc. Law, 742. The proving of *one* false pretense is enough. 35 Ark. 396.

WINCHESTER, Special J. The record discloses that at the ——— term, 1893, of the Pulaski circuit court, W. E. Woodruff was indicted for the crime of false pretenses, said indictment containing two counts. A demurrer was interposed by the defendant on the ground that more than one offense was charged in the indictment, and, the state electing to stand on the first count in the indictment, the demurrer was overruled. The defendant entered a plea of not guilty, and filed a motion for a change of venue, and the case was sent to Perry county. Here the defendant entered a demurrer in short on the record, which was overruled. The case was

tried, the jury returning a verdict of guilty, and assessing defendant's punishment at imprisonment for one year in the state penitentiary. A motion was filed in arrest of judgment, which was overruled, and defendant was sentenced in accordance with the verdict. He filed a motion for new trial, which was overruled, took his bill of exceptions, and prayed an appeal to this court, which was granted by the chief justice. All of the instructions to the jury asked by the defendant were refused, and the only instructions given were given of the court's own motion.

The appellant was indicted under section 1573, Sandels & Hill's Digest, which is as follows: "Every person who, with intent to defraud or cheat another, shall designedly, by color of any false token or writing, or by any other false pretense, obtain a signature of any person to any written instrument, or obtain from any person any money, personal property, right in action, or other valuable thing or effects whatever, upon conviction thereof shall be deemed guilty of larceny, and punished accordingly.

Sufficiency of indictment for false pretenses.

The indictment charges: "The said William E. Woodruff, in the county and state aforesaid, on the 6th day of January, 1891, being then and there the duly qualified and acting treasurer of the state of Arkansas, unlawfully and feloniously intending and devising to cheat and defraud the state of Arkansas, and James. P. Eagle, and W. S. Dunlop, and Ben. B. Chism, who, together with the said William E. Woodruff, constituted the state debt board of Arkansas, falsely, fraudulently and designedly did pretend and represent to the said James P. Eagle, W. S. Dunlop and Ben B. Chism, members of the state debt board of Arkansas as aforesaid, that he, the said William E. Woodruff, who, at the time aforesaid, was the duly qualified and acting treasurer of the state of Arkansas, had on the 12th day of Decem-

ber, 1890, received of and from one Johnson L. Jones
certain coupons and bonds of the state of Arkansas, to-
wit : (description omitted), being a total of 171 coupons
of the value of $30 each, and that the said Johnson L.
Jones desired to exchange the same for state certificates
of indebtedness, commonly called bond scrip, and that
said coupons were a valid and outstanding charge
against the state of Arkansas, and that the bonds from
which said coupons had been clipped had been redeemed,
and which coupons he, the said William E. Woodruff,
then and there exhibited and presented to the said James
P. Eagle, W. S. Dunlop and Ben B. Chism, members of
the state debt board of Arkansas as aforesaid, by means
of which false pretenses and representations, he, said
William E. Woodruff, did then and there fraudulently
and feloniously obtain the signatures of James P. Eagle,
governor of Arkansas, and president of the state debt
board, W. S. Dunlop, auditor of the state of Arkansas,
and member of the state debt board, and of Ben B.
Chism, secretary of the state of Arkansas, and secre-
tary of the state debt board of Arkansas, to a written
instrument, to-wit, to order No. 126 of the state debt
board of Arkansas, authorizing him, the said William
E. Woodruff, treasurer of the state of Arkansas as
aforesaid, to issue state certificates of indebtedness,
commonly called bond scrip, to John L. Jones, to the
amount of $5,130, in exchange for the said 171 coupons,
as above described and set forth, which said written in-
strument was in words and figures as follows, to-wit
(Order omitted) : and which said written instrument,
with the signature of the said above named James P.
Eagle, governor of Arkansas, and president of the state
debt board, and W. E. Woodruff, treasurer, and W. S.
Dunlop, auditor of the state of Arkansas, and a mem-
ber of said state debt board, and Ben B. Chism, secre-
tary of the state of Arkansas, and secretary of said

state debt board, signed thereto, was then and there delivered to the said Wm. E. Woodruff, treasurer as aforesaid, it being of the value of $5,130." Then follows a negation of the alleged false pretenses and representations, and the following : "And the bonds from which said coupons had been clipped had not been redeemed, but said coupons had been received at some date previous to December 12th, 1890, into the treasury of the state of Arkansas, in payment of debts due the state of Arkansas ; all of which, he, the said Wm. E. Woodruff, then and there well knew, against the peace and dignity of the state of Arkansas."

The appellant questions the sufficiency of the indictment by demurrer, in his motion in arrest of judgment, and by apt instructions, saying that it charges no public offense. His main contention is that the *order* upon which the indictment is predicated is an instrument unknown to the law.

The indictment under our statute sufficiently charges the crime of false pretenses. Sandels & Hill's Dig. sec. 1573 ; *Ib.* secs. 2075–2076 ; *Wood* v. *State*, 47 Ark. 488. By the acts of 1887 (approved April 5, 1887), the state debt board was created, composed of the governor, secretary and auditor of state, having certain duties, and clothed with certain powers, as therein set out. This act was amended by an act, approved April 9, 1889, which by its terms was to take effect and be in force from and after its passage. By the first section of the latter act the treasurer of state was made a member of the state debt board. By the third section of both acts it is provided "that the entire state debt board shall be necessary for the transaction of business." Sections six (6), nine (9) and eleven (11) of the act of 1889 will be noticed particularly in this connection. These sections read as follows :

"Sec. 6. The treasurer shall, under and by direction of the state debt board, pay out the money now in or hereafter to be paid into the sinking fund by redeeming, under such regulations as the state debt board may adopt under the provisions of this act, all of the five and six per cent. bonds of the State Bank and Real Estate Bank of Arkansas, and the bonds and past due coupons of the six per cent. funding bonds of 1869 and 1870, and the overdue interest on the same, now outstanding, excepting those now belonging to the United States, and those held in trust by the United States, and those that have been declared illegal by amendment to the constitution of this state, numbered one (1), and such of the refunded bonds of the state as may be found to have been issued in lieu of the bonds of the state which were illegally disposed of by the officers, agents or commissioners of the Real Estate Bank of Arkansas, or of the State Bank of Arkansas."

"Sec. 9. Said board shall not accept any proposal for sale at a greater price than the par value and accrued interest of any such bonds. Nor shall said board accept a proposal for sale of less than the whole of any bond, including interest, nor at any time make a partial payment on any bond, and no coupons shall be paid unless attached to and surrendered with the bond. *Provided*, that where interest coupons may be outstanding, and the principal of the bond from which they were taken has been paid in full, such coupons may be treated as though they were original bonds. *Provided* further, that said state debt board may reject any and all bids under the provisions of this act."

"Sec. 11. That said board may from time to time direct the treasurer to cause to be engraved and printed, in denominations of 1, 2, 5, 10, 20, 50, or 100 dollars, state certificates of indebtedness, to be signed by the treasurer, and exchanged by him, upon the order of the

board, for any of the outstanding, valid and undisputed bonds and matured coupons of the state, under the same restrictions and limitations and upon the same terms and conditions as prescribed for the purchase of bonds in sections six (6) and nine (9) of this act. And the sum of two thousand dollars, payable out of the sinking fund, is hereby appropriated to pay for the engraving and printing of said certificates, for the two years commencing on and after the date of passage of this act.''

In pursuance of the powers granted it in these sections the state debt board adopted the following rules and regulations:

"LITTLE ROCK, May 8, 1889.

"The state debt board met. Present, J. P. Eagle, governor; W. S. Dunlop, auditor; W. E. Woodruff, treasurer, and B. B. Chism, secretary of state. On motion, the following regulations were adopted. Additional regulations for transacting of business of the state debt board.

"4th. Holders desiring to convert bonds into certificates of indebtedness shall file the same with the treasurer of state for examination and safe keeping. If receivable, the treasurer shall give an official receipt therefor, describing the bonds and coupons by numbers and dates, and the holder shall present the same to the secretary of the board, who shall enter in the record a memorandum authorizing the exchange after the order shall have been signed by the board, also describing the bonds and coupons by numbers and dates. At the next meeting of the board the treasurer shall present all the bonds filed for exchange since the last meeting, for inspection and examination by the board. If found correct, an order shall be made directing the treasurer to issue and deliver to the proper holder of the bonds filed the correct amount in certificates to which each of them is entitled. And all bonds so presented for exchange

into certificates shall be immediately canceled by the board, and returned to the treasurer, who shall keep the same as vouchers, and make all proper entries upon his books.

"On motion the board adjourned.

> JAMES P. EAGLE, Governor,
> W. S. DUNLOP,
> BEN. B. CHISM, Sec'y State.
> W. E. WOODRUFF."

It will be seen that the treasurer was authorized by section 11 of this act to exchange the state certificates of indebtedness *upon the order of the board* for any outstanding, valid and undisputed bonds and matured coupons of the state, *under the same restrictions and limitations, and upon the same terms and conditions, as prescribed for the purchase of bonds in sections six (6) and nine (9) of this act.*

Hence this *order* was essential to the exchange of coupons for state certificates of indebtedness, and the treasurer had no authority to act without it. It was as much a part of the transaction of exchanging the coupons for state certificates of indebtedness as was the treasurer's receipt to the person who deposited the coupons with him for exchange.

By the regulations of the board this *order* was delivered to the party who presented the treasurer's official receipt for the coupons, and the holder could get the state certificate of indebtedness from the treasurer only upon this order. It is a paper, a "written instrument," such as was contemplated in the section under which the indictment was found, and it is alleged that it was signed by all the members of the state debt board, and delivered to the appellant. 2 Bish. Cr. Law, sec. 460, sub. 4; *People* v. *Genung,* 11 Wend. 18; *People* v. *Gates,* 13 Wend. 311.

The appellant presents for our consideration sixty-six exceptions to as many alleged erroneous rulings of the court in the progress of the trial. We shall notice only such of these as seem to the court essential to a proper disposition of this case.

Proving general balance of account.

The appellant excepted to the introduction of the testimony of James P. Eagle and Thomas H. Simms, who were called by the state, as the record recites, "in rebuttal," and who testified as to the state of appellant's coupon account, and who were allowed to state, over his objection, the one as to the result of the investigations of the "burning board," which commenced its work in 1891, of which he was a member, and the other as to the result of his investigations as special master in the case of the *State of Arkansas* v. *W. E. Woodruff*, *et al.*, pending in the Pulaski chancery court, which investigation was made in 1892. We discuss these objections together, because the same principle controls in both of them. Each witness states that a report was made showing the result of the investigations, and appellant contends that the reports were the best evidence.

The investigations of the "burning board," as the record discloses, occupied six months, and the investigation of Special Master Simms sixteen weeks. Each was allowed to state the *balance* found against appellant on his coupon account. It is proper to say here that these investigations were of the accounts and affairs of appellant's office as treasurer of state.

It is held that a witness who has inspected the accounts between the parties may be permitted to testify as to a *general balance*, but will not be permitted to give evidence of the particular contents of the books. 1 Greenl. Ev. (15 ed.), sec. 93; *Leeser* v. *Boekhoff*, 38 Mo. App. 453.

And especially is this proper where, as in this case, the evidence is the result of voluminous facts, and the

inspection of many books and papers, the examination of which could not conveniently take place in court, and where, too, the appellant was a party to these proceedings, and has had ample time to inspect these reports, and might by cross-examination have tested the accuracy of the statements made by these witnesses. 1 Greenl. Ev. sec. 93; 1 Rice, Ev. sec. 151.

The majority of the court is of opinion that the testimony was properly admitted.

Appellant insists that the testimony of Hudson and Dewoody, witnesses introduced by the state, should have been excluded, because they were allowed to testify as to facts disclosed by memoranda, which appeared upon envelopes which each held in his hands, which memoranda each stated were made by him at the time of the transactions to which they referred, and truly represented the transaction; each stating that he relied upon the memoranda for his statements, and not upon present recollections. The evidence was admissible. 1 Greenl. Ev. secs. 436, 437 and 440.

*Right of witness to refresh memory.*

Appellant also insists that J. B. Moore's testimony was improperly admitted. This witness testified that he was employed in the office of the secretary of state; that he had searched in that office for the original report made by the state debt board to the legislature of 1887, but could not find it. He stated further, "I have here the original senate journal for that year." He was allowed to read from said journal extracts from said report with reference to certain bonds from which some of the coupons named in the indictment had been clipped —these extracts tending to prove that the bonds were outstanding, that they had not been redeemed. This testimony was properly admitted. The report was signed by the appellant as a member of the state debt board. The secretary of state was the proper custodian of the original report and of the senate journal.

*Proving lost document by secondary evidence.*

Sandels & Hill's Dig. sec. 3171 (act Jan. 4, 1849); *Ib.* sec. 3547 (act Dec. 14, 1875). The original not having been found where it ought to be, the original senate journal was admissible. Sandels & Hill's Dig. sec. 2880 (act Jan. 4, 1849); 1 Greenl. Ev. secs. 483, 484 and 491.

*Admissibility of deposition taken in another case.* Appellant offered in evidence the deposition of M. L. Bell, taken June 12th, 1893, by which the state, in a case then pending in the Pulaski chancery court wherein the state of Arkansas was plaintiff, and the appellant, and the sureties on his official bond were defendants. It was admitted by the state that this witness had been duly summoned to testify for defendant on the trial of this case, and that he had since died.

The testimony of a deceased witness can be used in the trial of a cause, when admissible at all, only upon conditions well known to every practitioner. 1 Greenl. Ev. secs. 163, 164 and 165.

It is stated by Mr. Weeks that, as a general rule, depositions are in no case admissible in criminal proceedings unless by force of *express statutes*, or possibly by consent of the prisoner in open court. Weeks, Dep. sec. 558; 3 Greenl. Ev. sec. 11; *McLane* v. *Georgia*, 4 Ga. 335, and *Dominges* v. *State*, 15 Miss. 475. And in section 540, the same author (Weeks, Dep.), says: "In criminal proceedings, the latitude allowed in some civil cases at common law, in allowing depositions of witnesses who cannot be found after diligent search, does not obtain, whether the depositions be taken before a magistrate or coroner    *    *    *    This rule obtains both in England and America. In the latter country it has been held that both where the witness could not be found within the jurisdiction, but was reported to have gone to an adjoining state, and where he was proved to have left the state after being summoned to attend at the trial, his deposition was equally inadmissi-

ble." *Wilbur* v. *Selden*, 6 Cow. 162; *Finn's Case*, 5 Rand. 701; 1 Taylor, Ev. sec. 442.

"Under statutes, or by consent of the prosecuting officer, evidence may be taken by the defendant by ordinary deposition." Bish. Crim. Pro. (3 ed.), sec 1206; 3 Rice, Ev. p. 381.

" The state, therefore, cannot authorize the taking and using of depositions against him (defendant), but he may use the depositions of witnesses in his behalf under any state of case that the legislature may allow." *Kaelin* v. *Com.*, 84 Ky. 354.

In offering this deposition appellant made no showing except that the witness had been summoned, (and was dead). Without deciding whether the deposition was admissible, had a proper showing been made, the majority of the court is of opinion that it was properly excluded.

The appellant insists that he was prejudiced by certain remarks of the prosecuting attorney, who, in the course of his argument, stated "that this was a case of special interest to every taxpayer in the state, and to everyone of the jury, and that in consequence of its special interest, and the concern that all the people felt in the result of it, he had asked the attorney general of the state to assist him in the prosecution, and the attorney general had done and was doing so, because it was his duty under the law, relating as it did to the revenue raised by taxes paid by the people." While we do not find it in the record, yet we gathered it from the oral argument before us, as an *admitted fact*, that one of the learned attorneys for the appellant had sharply questioned the active participation of the attorney general in the prosecution, and that these remarks of the prosecuting attorney were made in explanation of his presence in the case. We find no prejudicial error in these remarks.

*When counsel's remarks not prejudicial.*

Presumption
is in favor of
trial court's
action.

Appellant urges as a ground of reversal that the attorney general, in the closing argument in the case, was guilty of misconduct. The record states that the attorney general "was permitted by the court in said closing argument, and over and against the objection of defendant, for the reason that if the conviction was wrong the governor would pardon him." The transcript is evidently incomplete, but this court must consider it as it finds it, as to the remarks objected to, and must conclude that the trial judge properly overruled the objection. Every person accused of a public offense is entitled to a fair and impartial trial, and, if convicted, should be convicted because the law and the testimony justify it. This court has heretofore, on more occasions than one, set the seal of its disapproval upon a practice sometimes resorted to by zealous advocates of injecting into their speeches matters outside the record and outside the scope of legitimate argument. And, while the great weight of authority seems to be that a direction from the trial judge to the jury to disregard such remarks cures the harm, yet it is possible that even an admonition from the judge to the jury to disregard the objectionable remarks may not always remove from their minds the impressions made, and it results that harm may come to the accused. Hence the duty of judges and the attorneys representing the state to guard carefully and jealously the constitutional and statutory rights of the accused.. *Vaughan* v. *State*, 58 Ark. 353·; *Little Rock, etc., R. Co.* v. *Cavenesse*, 48 Ark. 106; *Holder* v. *State*, 58 Ark. 473.

Instruction
as to false pre-
tenses disap-
proved.

We do not deem it necessary to discuss all the instructions asked by the appellant, nor all of his objections to the instructions given by the court. We notice, however, his instruction No. 4, refused by the court. "If you find from the evidence that the defendant was the holder of the coupons mentioned in the indictment,

and if they did not belong to the state, but belonged to the defendant himself, or to some other person for whom he held them, he cannot be convicted for obtaining the signature of the members of the state debt board to an order to exchange these for state certificates, it matters not what representations be made for that purpose."

In the opinion of a majority of the court this instruction was properly refused. It is true that the writers upon criminal law state the proposition that a false representation tending merely to induce one to pay a debt previously due from him is not within the statute against obtaining money by false pretenses, though payment be thereby obtained (2 Bish. Crim. Law, sec. 466); or, as Mr. Wharton states it, "that the pretence used *honestly* (the italics ours) to collect a just debt has been ruled to be a defense." 2 Whart. Crim. Law, sec. 1184*a*. See also Colby's Crim. Law, p. 566. These authors quote the same cases as sustaining the text. We have carefully examined all these cases, and find they are decided upon the theory that the accused gets only what is due him, and hence no wrong is done ; following *Rex* v. *Williams*, 7 Carr. & P. 354. In this case the servant of a creditor went to the debtor's wife and got from her two sacks of malt, saying his master had purchased them of her husband, which was false. It was ruled by Coleridge, J., on an indictment against the servant, that if his object was not to *defraud*, but merely to enable his master to compel payment of the debt, he must be acquitted. The cases cited by the text writers in support of this contention can be numbered upon the fingers of the two hands.

It has been held, however, to be no defense to a charge of obtaining money by false pretenses that the person from whom the money was obtained by the prisoner was at the time indebted to the prisoner to an amount equal to said sum obtained by the false repre-

sentation, and that it was the intention of the prisoner to apply such money on such debt.  *People* v. *Smith*, 5 Parker, 490, cited in Colby's Crim. Law, p. 566.

This decision seems really more in consonance with *Rex* v. *Williams*, *supra*, than the others cited *contra;* and, even applying the law as stated in the opinion of Coleridge, J., to the instruction under consideration, it would seem that it should be qualified by his statement "if the object was not to defraud," but merely to collect his debt.

But not one of the text writers, as far as we have been able to discover, and none of the cases cited, presents such a state of facts as we have here. In those cases one *individual* had practiced his deceptions upon another *individual.* Here the contention is that the treasurer of the state, and a member of the state debt board, undertakes by false pretenses to obtain advantage of the state, not *to collect a debt*, but to obtain in exchange for coupons, which can be used for one purpose only,—"in payment of the purchase money of lands whereof the state has title by reason of the foreclosure of mortgages executed to the said bank," (Real Estate Bank, Acts 1879, p. 10) and for the payment of which no provision is made, and the collection of which he cannot enforce,—more valuable evidences of indebtedness, to-wit: "state certificates of indebtedness," which are receivable, not only for the same purpose for which coupons are receivable, but also for sinking fund tax, for the state's *pro rata* of the purchase money paid for lands forfeited to the state for non-payment of taxes, and for liquor licenses collected on the part of the state (Acts 1889, p. 161), and for the payment of which an annual tax is levied "as an inviolable condition" of the contract. And, besides, in the indictment, the appellant is charged with obtaining the signatures of the members of the state debt board to an order authorizing

the treasurer to exchange coupons clipped from bonds which had *not been redeemed* for state certificates of indebtedness, which exchange was forbidden by law, Acts 1889, p. 161. The instruction asked wholly ignores this provision. But, aside from these reasons, we hold that it is against public policy, subversive of sound morals, and injurious to the best interests of the state —a thing not to be tolerated—that an officer of the state shall, in violation of express enactment, in violation of his trust, and by false pretenses obtain and enjoy an advantage, the fruits of his deception, and not be liable to punishment, even though a different rule might prevail as to similar transactions between individuals.

The court is of the opinion that the other instructions asked by the appellant were properly refused ; for, while some of them, no doubt, correctly state the law, yet these, we think, were covered by the instructions given.

We come now to consider appellant's objections to the instructions given by the court, only two of which we will notice. He contends that there was error in the third proposition of the first instruction : "The court instructs the jury that it is not necessary that the state should show that the representations made were false as to all the coupons mentioned in the indictment ; but it is sufficient if they were false, and known by defendant to be so, as to any one or more of said coupons, of the value of more than ten dollars." The contention is that the pretenses must be proved as laid in the indictment as to *all* the coupons. The law seems well settled against this contention. In presenting these 171 coupons as exchangeable under the law for state certificates of indebtedness, it is as though he had said of each coupon, this is a valid outstanding obligation of the state, and the bond from which it was clipped has been

Sufficiency of proof of false pretense.

12

redeemed. The holder is entitled to the exchange. The authorities are conclusive. *State* v. *Vandimark*, 35 Ark. 396 ; Rapalje on Larceny, secs. 433, 434 ; 2 Bish. Crim. Law, sec. 418, and cases cited.

Necessity of specific intent to defraud.

Appellant challenges the court's second instruction, which contains the following statement of the law: " The jury are instructed that coupons clipped from bonds that have not been redeemed cannot be exchanged for bond scrip, and such an exchange is a fraud upon the state, and an intention to have such exchange made, knowing the bonds from which the coupons were clipped had not been redeemed, is an intention to defraud the state." This statement of the law to the effect that an intention knowingly to exchange coupons clipped from unredeemed bonds is in law an intention to defraud the state, is nowhere modified in the charge of the court. On the contrary, the court returned to it, and emphasized it in another portion of his charge. After having properly told the jury that if the defendant, by inadvertance or mistake, took from the treasury coupons, honestly believing that they were his own, and not the property of the state, leaving in their stead others of same kind and value belonging to him, this would show an absence of intention to defraud, without which intention defendant would not be guilty, he adds these words, "provided he did not know that said coupons so taken were clipped from bonds that had not been redeemed."

Thus it is apparent that the court announces that, while ordinarily it is necessary, in order to convict, that a *fraudulent* intent to defraud be shown, yet that such actual intent to defraud need not be shown if the defendant attempted to exchange coupons known to have been clipped from bonds which were unredeemed. "Such an exchange," said the court, "is a fraud upon the state, and an intention to have such an exchange made, knowing the bonds from which the coupons were clipped had

not been redeemed, is an intention to defraud the state."
We do not think this was a correct statement of the law
in this case. A material allegation in this indictment was
that the defendant designedly, and with the intention to
defraud the state, made certain false representations to
the board. In order to convict, it must be shown by the
evidence that the defendant made these representations
to the board with an actual intent to defraud the state.
Whether such an intention exists on his part is a ques-
tion for the jury, and the court cannot take it from them
by telling them that if certain facts be proved, they
constitute an intention to defraud the state. The de-
fendant may have known that the coupons which he
asked to exchange were clipped from unredeemed bonds,
and yet intended no fraud upon the state. He testified
that he did not intend to defraud the state, nor to make
any false representations to the board, and, however un-
reasonable this statement may have appeared to the
court, it was the constitutional right of the defendant
to have that question submitted to the jury. He may
have known that the coupons which he asked to ex-
change for state certificates of indebtedness were clipped
from bonds which had not been redeemed, and yet as a
fact intended no violation of the law. Ordinarily, one
cannot set up ignorance of the law as an excuse for a
violation of the law, but there is an exception when, to
constitute the offense, a particular intent must exist on
the part of the defendant at the commission of the act;
in such case ignorance of the law, like any other fact,
may be shown in explanation and extenuation of the act.

"When the act done is *malum in se*, or where the
law which has been infringed was settled and plain, the
maxim, *Ignorantia legis neminem excusat*, in its vigor
will be applied, but where the law is not settled, or is
obscure, and where guilty intention, being a necessary
constituent of the particular offense, is dependent upon

a knowledge of the law, this rule, if enforced, would be misapplied." *Cutler* v. *State*, 36 N. J. L. 127; Rapalje, Larceny, sec. 229; *Felker* v. *State*, 54 Ark. 497; *State* v. *Norton*, 76 Mo. 180.

We have, in view of the official relation which appellant bore to the state, and in view of the many serious questions presented, given this case careful study. We have considered every one of the many assignments of error presented in the record, and we find that only the one last discussed, to a majority of the court, seems well taken.

For the error indicated above, the judgment is reversed, and the case remanded, with instructions to grant appellant a new trial.

BATTLE, J., (dissenting.)   I dissent from that part of the opinion of the court in which it holds that the fourth prayer of the appellant for instructions to the jury was properly refused by the circuit court. In my opinion it should have been granted. The prayer referred to is as follows: "If you find from the evidence that the defendant was the holder of the coupons mentioned in the indictment, and if they did not belong to the state, but belonged to the defendant himself, or to some other person for whom he held them, he cannot be convicted for obtaining the signatures of the state debt board to an order to exchange them for state certificates, it matters not what representations he made for that purpose."

To constitute the offense of which the appellant was accused, four things must concur:   (1) There must be an intent to defraud; (2) there must be actual fraud; (3) false pretenses must be used for the purpose of perpetrating the fraud; and (4) the fraud must be accomplished by means of the false pretenses made use of for the purpose."

A false representation by which one is induced to pay what he justly owes, or perform his duty, is not a false pretense within the meaning of the statute creating the offense, because no legal injury is suffered.

In *Rex* v. *Williams*, 7 C. & P. 354, 32 Eng. C. L. R. 653, "It appeared that the prosecutor, Peter Williams, owed John Williams, the prisoner's master, a sum of money, of which John Williams *could not procure payment;* and that the prisoner, in order *to secure to his master the means of paying himself*, had gone to prosecutor's wife in her husband's absence, and told her that his master had bought of her husband two sacks of malt, and had sent him to fetch them away; and that thereupon the prosecutor's wife delivered the two sacks of malt to the prisoner, who carried them to his master. It further appeared that the *pretense was false*, and that *the prisoner knew it to be false at the time he used it*." Judge Coleridge, in summing up, charged the jury as follows : "Although *prima facie* everyone must be taken to have intended the natural consequence of his own act, yet if, in this case, you are satisfied that the prisoner did not intend to defraud Peter Williams, *but only to put it in his master's power to compel him to pay a just debt*, it will be your duty to find him not guilty. It is not sufficient that the prisoner knowingly stated that which was false, and thereby obtained the malt ; you must be satisfied that the prisoner at the time intended to defraud Peter Williams."

In *People* v. *Thomas*, 3 Hill, 169, the indictment charged substantially the following facts : "Jones, having executed his negotiable note to Thomas for $28.28, dated 19th February, 1838, and payable one day after date, the latter, in March afterwards, called for payment, falsely pretending to Jones that the note had either been lost or burned up; by which false pretenses Thomas unlawfully, etc., obtained from Jones the sum

of $28.28, with intent to cheat and defraud Jones; whereas in truth, etc., the note had not been lost or burned up, all of which the said Thomas, when he made the false pretense and obtained the money, well knew," etc. Of this indictment the court said: "*Non constat* from the indictment that Jones sustained any damage by the false representation, nor that there was an intent on the part of Thomas, at the time of the representation, to work any damage. The note was due, and payment made. This was the only consequence—a thing which Jones was bound to do. A false representation, by which a man may be cheated into his duty is not within the statute."

In *People* v. *Getchell*, 6 Mich. 496, the defendant was indicted for procuring the indorsement of the prosecutor on a promissory note by falsely pretending that a former note for the same amount and indorsed in like manner was destroyed. After proof of the facts charged, the defendant offered and the trial court refused to allow him to show that he was a partner with the prosecutor; that the latter was bound by an agreement with him to endorse for him to an amount considerably larger than the two notes, but had refused to do so, and that the money obtained on the notes was used in their business for their joint benefit. It was held that the evidence should have been received as tending to disprove the presumption of an intent to defraud. The court said: "The object of the defense in this case, in offering the rejected evidence, was to show that there was no intent to cheat or defraud—the untruth of the pretense being admitted. A falsehood does not necessarily imply an intent to defraud, for it may be uttered to secure a right, and, however much and severely it may be reprobated in ethics, the law does not assume to punish moral delinquencies as such. *To defraud is to deprive another of a right, of property or of money*, and

this may be accomplished by falsehood, by withholding the right of property, or by force."

In *Com.* v. *McDuffy*, 126 Mass. 467, it appeared that the defendant was to build a house, and was to pay all bills for materials used in the house with money which was to be given for that purpose, from time to time, upon the presentation of the bills for the materials; and that upon false reprsentations he obtained more money than was necessary to pay for the materials. He was indicted for obtaining money by false pretenses. He "contended that he could not be convicted upon the indictment, because, upon the settlement at which it was alleged he made the false representations set forth, he had been allowed nothing for his services in building the house; that he was entitled to receive for his services the sum of $650; and that, if the sum he received in fact was not more than enough to pay him for the bills actually paid, and for his services, then he was not guilty of false pretenses, even if he made untrue statements, because he had defrauded no one." The court held that upon proof of these facts he was entitled to an acquittal. *Com.* v. *Hawkins*, 128 Mass. 79.

In *State* v. *Hurst*, 11 W. Va. 54, the court held that "the procuring of the payment of a just debt, already due, by false pretenses," is not an indictable offense. It said: "It is doubtless immoral for a person by false pretenses to obtain the payment of a just debt. The end sought may be just but such an end will not, by a correct code of morals, justify the use of improper means; but the law does not, in many instances, attempt the enforcement of good morals, and the question is, whether the use of false pretenses to obtain a claim justly due is, within the true meaning of this criminal statute, a fraud. To so construe this statute would in my judgment, consign to the penitentiary as thieves

many persons who cannot be classed with common thieves, without breaking down all our ideas of distinctions in degrees of immorality. I think, therefore, that, within the true meaning of this statute, a man cannot be held guilty of procuring money by false pretenses, *with intent to defraud, who has merely collected a debt, justly due him,* though in making the collection he has used false pretenses." And in *Com.* v. *Henry,* 22 Pa. St. 253, Woodward, J., said : "A false representation by which a man may be cheated into the performance of a duty is not within the statute."

Mr. Bishop and Mr. Wharton say : "Under the statute against false pretenses, it is not indictable to induce one by the pretenses to pay what he justly owes, because he is not thereby legally injured. 1 Bishop's New Cr. L. sec. 438; 2 *Ib.* sec. 466; 2 Wharton, Criminal Law (9th, 3d.), sec. 1184*a*, 1197.

The principle on which the foregoing authorities rest is not confined to cases in which a creditor has induced his debtor, by false representations, to pay a debt. It is applicable to such cases because an intent to defraud and an actual fraud committed are essential to the commission of the crime of false pretenses, and these elements were lacking in those cases. Where they are absent, the crime cannot exist. Hence in every case where the false representation is made by one for the sole purpose of inducing another to discharge a duty, and it has that effect, the crime is not committed. So where a creditor, by false representations, induces his debtor to accept one of his (debtor's) obligations to pay money, and to execute another of more available form in lieu thereof, the same being equal in every respect, he is not guilty of the offense. *Rex* v. *Williams, supra,* is another illustration of the rule. In that case the accused procured, by falsehood, two sacks of malt, in order to secure to his master the means of collecting a debt; and

yet he was acquitted of false pretenses, because in so doing he did not defraud the prosecutor.

After a diligent search, I have been able to find only one case in which this rule is denied, and that is *People* v. *Smith*, 5 Park. Cr. Rep. 490. In that case it was held that it was "no defense to a charge of obtaining money by false pretenses that the person from whom the money was obtained by the prisoner was, at the time, indebted to the prisoner to an amount equal to the sum obtained by the false representation, and that it was the intention of the prisoner 'to apply the money to the payment of the debt.'" This decision was based, in part, on the impolicy of allowing any one the right of self-redress. This right, it is said, is allowed only in the "well known instances of self-defense, recaption or reprisals, entry on lands and tenements when another person has without any right taken possession thereof, and abatement of nuisances;" and in those cases only when it can be exercised without force or terror or any breach of the peace. But, if this be true, does the wrongful exercise of the power of self-redress supply any of the elements necessary to constitute false pretenses? The debtor was deprived of no right. He suffered no loss, but simply did his duty. How was he defrauded?

But it is said in *People* v. *Smith*, *supra*, that the collection of debts by the employment of fraud or falsehood may lead to strife, and is pernicious in its consequences. It is true that this mode of collection is immoral, and deserves the severest condemnation; but the law was never intended to be a complete code of morals. The fact that any act may be immoral, or evil in its consequences, does not prove that it is a public offense. Many moral delinquences may and do lead to crime and strife, but the law does not make them penal, and punish those guilty of them, for that reason. It is

only when they amount to crimes that the guilty are punishable as criminals.

Again, in *People v. Smith*, *supra*, it is said that the intent of the creditor who takes money furtively out of the desk of his debtor and applies it to the payment of his debt is the same as the intent of him who obtains the money from his debtor by false pretenses for the same purpose. But, with deference to the learned judge who delivered the opinion of the court in that case, I do not think so. In the former case the intent is to deprive the owner of his money without his knowledge or consent, and in the latter to obtain it openly, with his knowledge and consent, by deception. There is only one thing in common in both cases, and that is the intent to appropriate the money in the same manner. But, be that as it may, standing alone in either case, or in any other case, without acts there is nothing criminal in the intent. In both cases it is immoral. According to the acts which accompany it, it is a trespass, obtaining money by false pretenses, no crime, or, according to the opinion in *People* v. *Smith*, a larceny. In the latter case it is not a trespass, because the money was procured by consent ; it was not obtaining money by false pretenses, because there was no intent to perpetrate a legal fraud ; and it was not a larceny, because it was procured with the knowledge and consent of the owner.

In the opinion of the court in this case it is said : "In order to convict, it must be shown by the evidence that the defendant made these representations to the board *with an actual intent to defraud the state*." Why? The court say : " The defendant may have known that the coupons which he asked to exchange were clipped from unredeemed bonds, and yet *intended no fraud on the state*." But the court, nevertheless, held that the fourth prayer of the defendant for an instruction was properly refused. Why? Because the state of Arkan-

sas was the party affected by the false pretenses? How
does that affect the guilt of the defendant? Does it not
require an actual intent to defraud the state to consti-
tute the offense in this case? The court has said so.
That is true. There must not only be an intent to
defraud, but an actual fraud committed. How, then,
can the fact that the state is the party affected by the
false pretense change the constituent elements of the
offense? There is only one statute defining the offense,
and it does not have one meaning when the state is
affected, and another in all other cases. But it has been
said that appellant was treasurer of Arkansas at the
time the offense is alleged to have been committed, and
should not be allowed to hold an advantage gained in
his official position by false representations. How does
that affect the offense? No one ought to take an undue
advantage of the state, let his position be what it may.
He ought not to take such an advantage of anyone. But
he, nevertheless, committed no indictable offense when
he induced the state by false representations to pay its
just debts in its own paper; because, if that be all he
has done, he has not defrauded the state of one cent, and
done no legal injury.

In his fourth prayer, the appellant asked the court
to instruct the jury that he could not be convicted of
the offense of which he is accused if they find that the
coupons described in the indictment did not belong to
the state, but to himself, or were held by him for some
other person, and that he procured an order of the state
board on the treasurer to exchange "state certificates
of indebtedness" for them, notwithstanding he pro-
cured the order by false representations. The certifi-
cates were for no greater amount than the coupons, and
there was evidence upon which to base the instruction;
and yet this court holds that the prayer was properly
refused. Why? Because, among other reasons, he

undertook by false pretenses to obtain an advantage of the state by exchanging coupons, which are receivable for one purpose, and for the payment of which no provision is made, and the collection of which he cannot enforce, for certificates which are more valuable, and receivable for many purposes. What advantage did he get? The state was not liable for any greater amount on account of the certificates than it was on the coupons. He did not receive in the former more than the amount of the latter. Neither were at par. Both were valid, but neither could be collected by process of law. But it is said that, in procuring the certificates, he did not attempt to collect a debt. If the evidence referred to by the fourth prayer be true he did, or attempted to do so, by accepting the certificates in payment or exchange for the coupons. It was not necessary that money be received or paid in satisfaction of the coupons to constitute a collection or payment. If he was the legal holder of the coupons, he had the right to accept the certificates, if tendered, in payment of them.

The instructions given by the circuit court are defective in failing to state fully what the jury should find as to the intention of the appellant before they could lawfully convict. This defect is fully shown in the opinion of the court. Nothing need be said in this behalf, further than I have already stated.

In other respects I concur in the opinion of this court, and in reversing the judgment of the circuit court.